UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

| | |
|---|---|
| MELISSA A. WORTHINGTON,<br><br>  Plaintiff,<br><br>v.<br><br>SOCIAL SECURITY ADMINISTRATION,<br><br>  Defendant. | Case No. 2:20-cv-00023<br><br>Chief Judge Waverly D. Crenshaw, Jr.<br>Magistrate Judge Alistair E. Newbern |

To:   The Honorable Waverly D. Crenshaw, Jr., Chief District Judge

**REPORT AND RECOMMENDATION**

Plaintiff Melissa A. Worthington filed this action under 42 U.S.C. § 405(g) seeking judicial review of the final decision of the Commissioner of the Social Security Administration (SSA) denying her application for disability insurance benefits (DIB) under Title II of the Social Security Act, 42 U.S.C. §§ 401–434. (Doc. No. 1.) The Court referred this action to the Magistrate Judge to dispose or recommend disposition of any pretrial motions under 28 U.S.C. § 636(b)(1)(A) and (B). (Doc. No. 4.) Before the Court is Worthington's motion for judgment on the administrative record (Doc. No. 16), to which the Commissioner has responded in opposition (Doc. No. 24). Having considered the parties' arguments and the administrative record as a whole, and for the reasons that follow, the Magistrate Judge will recommend that Worthington's motion for judgment on the administrative record be granted, the ALJ's decision be vacated, and this case be remanded for further administrative proceedings and rehearing consistent with this Report and Recommendation.

## I. Background

### A. Worthington's DIB Application

Worthington applied for DIB on January 13, 2017, alleging that she has been disabled and unable to work since that date as a result of fibromyalgia, post-traumatic stress disorder (PTSD), chronic depression, a bulging disc, osteoarthritis, chronic pain, Raynaud's syndrome,[1] carpal tunnel syndrome, chronic fatigue, and joint pain. (AR 89.[2]) The Commissioner denied Worthington's application initially and on reconsideration. (AR 106, 132.) At Worthington's request, an administrative law judge (ALJ) held a hearing regarding her application on September 12, 2018. (AR 60–87, 151.) Worthington appeared with counsel and testified. (AR 60, 67–78.) The ALJ also heard testimony from a vocational expert. (AR 79–85.)

### B. The ALJ's Findings

On March 4, 2019, the ALJ issued a written decision finding that Worthington was not disabled within the meaning of the Social Security Act and applicable regulations and denying her claim for DIB. (AR 38–49.) The ALJ made the following enumerated findings:

> 1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2021.
>
> 2. The claimant has not engaged in substantial gainful activity since January 13, 2017, the alleged onset date (20 CFR 404.1571 *et seq.*).
>
> 3. The claimant has the following severe impairments: fibromyalgia, spinal disorder, posttraumatic stress disorder (PTSD), depression, anxiety, and obesity (20 CFR 404.1520(c)).

---

[1] "Raynaud phenomenon is a condition in which cold temperatures or strong emotions cause blood vessel spasms. This blocks blood flow to the fingers, toes, ears, and nose." NIH Nat'l Libr. of Med., *MedlinePlus: Raynaud phenomenon*, https://medlineplus.gov/ency/article/000412.htm (last visited Aug. 3, 2021).

[2] The transcript of the administrative record (Doc. No. 13) is referenced herein by the abbreviation "AR." All page numbers cited in the AR refer to the Bates stamp at the bottom right corner of each page.

\* \* \*

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

\* \* \*

5. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b). She can lift and/or carry up to twenty pounds occasionally and ten pounds frequently. She can stand and/or walk, with normal breaks, for a total of six hours per eight-hour workday and can sit, with normal breaks, for a total of six hours per eight-hour workday. The claimant can never climb ladders, ropes, and scaffolds, she can frequently balance and crouch, and she can occasionally climb ramp and stairs, stoop, kneel, and crawl, In terms of mental limitations, the claimant can understand and remember simple and low-level routine tasks but not make independent decisions for complex and executive level tasks. She can occasionally interact with the public and coworkers in a routine work setting with infrequent and gradual changes.

\* \* \*

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565).

\* \* \*

7. The claimant was born on March 3, 1968 and was 48 years old, which is defined as a younger individual age 18–49, on the alleged disability onset date. The claimant subsequently changed age category to closely approaching advanced age (20 CFR 404.1563).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is 'not disabled,' whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569a).

\* \* \*

11. The claimant has not been under a disability, as defined in the Social Security Act, from January 13, 2017 through the date of this decision (20 CFR 404.1520(g)).

(AR 40–49.) The Social Security Appeals Council denied Worthington's request for review on February 19, 2020, making the ALJ's decision the final decision of the Commissioner. (AR 1–7.)

### C. Appeal Under 42 U.S.C. § 405(g)

Worthington filed this action for review of the ALJ's decision on April 23, 2020 (Doc. No. 1), and this Court has jurisdiction under 42 U.S.C. § 405(g). Worthington argues that the ALJ improperly evaluated her subjective complaints related to her fibromyalgia and failed to properly determine her mental functional limitations. (Doc. No. 17.) The Commissioner responds that the ALJ followed applicable regulations and that the ALJ's decision is supported by substantial evidence. (Doc. No. 24.) Worthington did not file an optional reply.

### D. Review of the Record

The ALJ and the parties have thoroughly described and discussed the medical and testimonial evidence in the administrative record. Accordingly, the Court will discuss those matters only to the extent necessary to analyze the parties' arguments.

## II. Legal Standards

### A. Standard of Review

This Court's review of an ALJ's decision is limited to determining (1) whether the ALJ's findings are supported by substantial evidence and (2) whether the ALJ applied the correct legal standards. *See* 42 U.S.C. § 405(g); *Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 833 (6th Cir. 2016) (quoting *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009)). "Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (alteration in original) (quoting *Consol. Edison Co. v.*

*NLRB*, 305 U.S. 197, 229 (1938)). Substantial evidence is less than a preponderance but "more than a mere scintilla" and means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quoting *Consol. Edison Co.*, 305 U.S. at 229); *see also Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014) (same). Further, "[t]he Social Security Administration has established rules for how an ALJ must evaluate a disability claim and has made promises to disability applicants as to how their claims and medical evidence will be reviewed." *Gentry*, 741 F.3d at 723. Where an ALJ fails to follow those rules or regulations, "we find a lack of substantial evidence, 'even where the conclusion of the ALJ may be justified based upon the record.'" *Miller*, 811 F.3d at 833 (quoting *Gentry*, 741 F.3d at 722).

### B. Determining Disability at the Administrative Level

Worthington applied for DIB under Title II of the Social Security Act, which is an insurance program that "provides old-age, survivor, and disability benefits to insured individuals irrespective of financial need." *Bowen v. Galbreath*, 485 U.S. 74, 75 (1988). To receive DIB, Worthington must establish that she had a disability on or before the last date she was eligible for insurance under Title II, which is determined based on her earnings record. *See* 42 U.S.C. § 423(a)(1)(A), (c)(1); 20 C.F.R. § 404.130. "Disability" in this context is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A).

ALJs must employ a "five-step sequential evaluation process" to determine whether a claimant is disabled, proceeding through each step until a determination can be reached. 20 C.F.R. §404.1520(a)(4). At step one, the ALJ considers the claimant's work activity. *Id.* § 404.1520(a)(4)(i). "[I]f the claimant is performing substantial gainful activity, then the claimant is not disabled." *Miller*, 811 F.3d at 834 n.6. At step two, the ALJ determines whether the claimant

suffers from "a severe medically determinable physical or mental impairment" or "combination of impairments" that meets the 12-month durational requirement. 20 C.F.R. § 404.1520(a)(4)(ii). "If the claimant does not have a severe impairment or combination of impairments [that meets the durational requirement], then the claimant is not disabled." *Miller*, 811 F.3d at 834 n.6. At step three, the ALJ considers whether the claimant's medical impairment or impairments appear on a list maintained by the SSA that "identifies and defines impairments that are of sufficient severity as to prevent any gainful activity." *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006); *see* 20 C.F.R. § 404.1520(a)(4)(iii). "If the claimant's impairment meets or equals one of the listings, then the ALJ will find the claimant disabled." *Miller*, 811 F.3d at 834 n.6. If not, the ALJ proceeds to step four. *Combs*, 459 F.3d at 643; *see also Walker v. Berryhill*, No. 3:16-1231, 2017 WL 6492621, at *3 (M.D. Tenn. Dec. 19, 2017) (explaining that "[a] claimant is not required to show the existence of a listed impairment in order to be found disabled, but such showing results in an automatic finding of disability and ends the inquiry"), *report and recommendation adopted*, 2018 WL 305748 (M.D. Tenn. Jan. 5, 2018).

At step four, the ALJ evaluates the claimant's past relevant work and "'residual functional capacity,' defined as 'the most [the claimant] can still do despite [her] limitations.'" *Combs*, 459 F.3d at 643 (alterations in original) (quoting 20 C.F.R. § 404.1545(a)(1)); *see* 20 C.F.R. § 404.1520(a)(4)(iv). Past work is relevant to this analysis if the claimant performed the work within the past 15 years, the work qualifies as substantial gainful activity, and the work lasted long enough for the claimant to learn how to do it. 20 C.F.R. § 404.1560(b)(1). If the claimant's residual functional capacity (RFC) permits her to perform past relevant work, she is not disabled. *Combs*, 459 F.3d at 643. If a claimant cannot perform past relevant work, the ALJ proceeds to step five and determines whether, "in light of [her] residual functional capacity, age, education, and work

6

experience," a claimant can perform other substantial gainful employment. *Id.* While the claimant bears the burden of proof during the first four steps, at step five the burden shifts to the Commissioner to "identify a significant number of jobs in the economy that accommodate the claimant's residual functional capacity and vocational profile." *Johnson v. Comm'r of Soc. Sec.*, 652 F.3d 646, 651 (6th Cir. 2011). "Claimants who can perform such work are not disabled." *Combs*, 459 F.3d at 643; *see also* 20 C.F.R. § 404.1520(a)(4)(v).

**III.     Analysis**

     **A.     The ALJ's Analysis of Worthington's Subjective Fibromyalgia Complaints**

"Fibromyalgia . . . is a medical condition marked by 'chronic diffuse widespread aching and stiffness of muscles and soft tissues.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243 n.3 (6th Cir. 2007) (quoting *Stedman's Medical Dicti6onary for the Health Professions and Nursing* at 541 (5th ed. 2005)). The Sixth Circuit has held "that fibromyalgia can be a severe impairment and that, unlike medical conditions that can be confirmed by objective testing, fibromyalgia patients present no objectively alarming signs." *Id.* at 243. For example, "fibromyalgia patients 'manifest normal muscle strength and neurological reactions and have a full range of motion.'" *Id.* at 244 (quoting *Preston v. Sec'y of Health & Human Servs.*, 854 F.2d 815, 820 (6th Cir. 1988)). Consequently, "[t]he process of diagnosing fibromyalgia includes (1) the testing of a series of focal points for tenderness and (2) the ruling out of other possible conditions through objective medical and clinical trials." *Id.*

The SSA recognizes that "[w]idespread pain and other symptoms associated with [fibromyalgia], such as fatigue, may result in exertional limitations that prevent a person from doing the full range of unskilled work in one or more of the exertional categories" that the SSA uses to determine individuals' RFCs. SSR 12-2P, 2012 WL 3104869, at *6 (July 25, 2012); *see also id.* at *3 (recognizing that fibromyalgia "symptoms, signs, [and] co-occurring conditions"

include "manifestations of fatigue, cognitive or memory problems ('fibro fog'), waking unrefreshed, depression, anxiety disorder, [and] irritable bowel syndrome" (footnotes omitted)).

SSA regulations require an ALJ determining disability to "consider all [of the claimant's] symptoms, including pain, and the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. § 404.1529(a). A two-step evaluation process applies to claims of disabling symptoms. SSR 16-3p, 2016 WL 1119029, at *2 (Mar. 16, 2016); 20 C.F.R. § 404.1529(a). First, the ALJ determines "whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce an individual's symptoms . . . ." SSR 16-3p, 2016 WL 1119029, at *2; 20 C.F.R. § 404.1529(b). If the ALJ finds that such an impairment exists, he must then "evaluate the intensity and persistence of those symptoms to determine the extent to which the symptoms limit [the claimant's] ability to perform work-related activities . . . ." SSR 16-3p, 2016 WL 1119029, at *2; 20 C.F.R. § 404.1529(c).

The SSA "recognize[s] that some individuals may experience symptoms differently and may be limited by symptoms to a greater or lesser extent than other individuals with the same medical impairments, the same objective medical evidence, and the same non-medical evidence." SSR 16-3p, 2016 WL 1119029, at *4. Thus, an ALJ may "not reject [the claimant's] statements about the intensity and persistence of [her] . . . symptoms or about the effect [her] symptoms have on [her] ability to work solely because the available objective medical evidence does not substantiate [her] statements." 20 C.F.R. § 404.1529(c)(2). Other factors relevant to evaluating the intensity, persistence, and limiting effects of an individual's symptoms include daily activities; the location, duration, frequency, and intensity of the claimant's symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication taken to

alleviate the symptoms; any measures used to relieve the symptoms; and other factors concerning the claimant's functional limitations and restrictions due to those symptoms. SSR 16-3p, 2016 WL 1119029, at *7; 20 C.F.R. § 404.1529(c)(3)(i)–(vii).

At her DIB hearing, Worthington testified that she stopped working because she "started having a lot of fatigue" and "fibro fog" that made her unable to "comprehend or remember things very well." (AR 67.) While she was employed, Worthington would try to address her fatigue by sleeping in her car during her lunch break. (AR 68.) She took intermittent medical leave from work to "protect [her] job" on days "when [she] had to call in sick . . . ," but ultimately quit working because she "was so tired" that she "couldn't stay there all day." (*Id.*) Worthington took opioids and other prescription medications to manage the fibromyalgia pain and pain in her neck and shoulders. (AR 69–71.) Asked about her primary sources of pain, Worthington testified that:

> I had a lot of headaches. My hip hurts a lot. But now on a daily basis, my neck and shoulders are bad. Sometimes that's the only place I hurt for a few days. And sometimes I just hurt all over. I feel like I have the flu most of the time. I've no energy.

(AR 71.) Worthington rated her pain at seven or eight on a ten-point scale without medication and at five on a ten-point scale with medication. (AR 71–72.)

The ALJ began his analysis of Worthington's subjective complaints by articulating the relevant standard for assessing a claimant's symptoms:

> In considering the claimant's symptoms, I must follow a two-step process in which it must first be determined whether there is an underlying medically determinable physical or mental impairment(s)--i.e., an impairment(s) that can be shown by medically acceptable clinical or laboratory diagnostic techniques--that could reasonably be expected to produce the claimant's pain or other symptoms.
>
> Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the claimant's pain or other symptoms has been shown, I must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's functional limitations. For this purpose, whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by

9

objective medical evidence, I must consider other evidence in the record to determine if the claimant's symptoms limit the ability to do work-related activities.

(AR 43–44.)

The ALJ then analyzed Worthington's subjective complaints as follows:

The claimant testified that her problems include fatigue and "fibro fog." She elaborated that she has problems with comprehension and memory that impeded her ability to function at work and fulfill her duties. According to the claimant, her supervisors felt she was not paying attention, and her problems also forced her to take advantage of Family Medical Leave Act time. The claimant testified that, in addition to her fibromyalgia, she experiences back pain caused by bulging discs, as well as neck and shoulder pain. She indicated that, before taking medication, her pain typically rates as a "7" or "8" on a scale of one to ten. The claimant asserted that she gets little done on a daily basis and often falls asleep in her recliner. With respect to mental health treatment, the claimant stated that she receives treatment for PTSD that stems from her father's history as an abuser/sex offender and her mother's histrionic personality. She cited crying, depression, and feeling sorry for herself as her primary symptoms. When asked to describe a recent trigger for her symptoms, the claimant stated that recent contact with her uncle, who is a great deal like her mother, caused nightmares. She also cited problems with focus. The claimant stated that she misses a lot of church now and is unable to go to meetings. She asserted that she cannot stand over a stove long enough to cook and misses out on spending time with her granddaughter due to her need for frequent rest breaks. She felt she could stand for about 45 minutes and would need a break after 40 minutes of walking. She can pick up her granddaughter, who weighs about 23 pounds, but it takes all of her strength. The claimant felt she could lift a ten to fifteen pound sack of potatoes a few times in a day.

After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

In early 2014, well before the alleged onset date, the claimant was diagnosed with probable fibromyalgia based on 12 positive tender points without atrophy or weakness. (See Exhibit 3F). In early 2016, a treatment note indicated she was taking several psychoactive drugs (Wellbutrin and Effexor) and a hydrocodone/acetaminophen combination and Percogesic for pain, as well as Xanax, as needed, and gabapentin before going to sleep. A subsequent record in 2015 indicated the claimant's morbid obesity was addressed with a gastric sleeve. (See Exhibit 2F).

The claimant began treatment with Dr. Richard Clark in late 2015. She indicated to him that she had been diagnosed with arthritis, fibromyalgia, and Raynaud's phenomenon in the past. (See Exhibit 4F). She was obese, with intact muscle strength, reflexes and gait, and her mental status and affect were normal. She continued to see Dr. Clark throughout 2016, complaining about neck pain and low back pain and intermittently endorsing anxiety and depression. Her physical examination remained essentially unremarkable other than some neck and low back stiffness that affected her ranges of motion. Testing in May of 2016 showed mild degenerative changes at L3-4 and dextroscoliosis of twelve degrees at L2-3. She also had mild levoscoliosis in her thoracic spine and mild bulging at C5-6. Straight leg raise testing remained negative, and the claimant's gait was unaffected.

Records of treatment in early 2017 continue to reflect essentially the same information. (See Exhibit 8F). The claimant continued to complain about neck pain that she asserted radiated into her upper extremities and low back pain that she stated radiated into her legs. Her gait, stability and reflexes remained normal, and straight leg raise testing was negative. She had neck and low back stiffness that inhibited her ranges of motion. In February of 2017, the claimant denied experiencing psychological problems, including depression and memory loss but continued to endorse neck and back pain. In May, her physical status remained stable, but she cited anxiety and depression without crying, anhedonia, or suicidal thoughts.

The claimant was examined by Dr. Cistola in June of 2017. (See Exhibit 9F). She cited fibromyalgia, Raynaud's phenomenon, bulging discs in her neck, arthritis in her back and carpal tunnel syndrome. Dr. Cistola's examination of the claimant revealed full ranges of motion in her neck and all peripheral joints, normal vision (with correction), and clear lungs. Her lumbar range of motion was 80 degrees flexion and 20 degrees extension. As previously noted, Phalen's and Tinel's testing was normal, and the claimant could engage in fine manipulation and gross dexterous movement with her hands. Her grip strength was intact, straight leg raise testing was negative, and there was no tripod sign. The claimant had tender points in her gluteal and trochanter areas. Her gait and station were normal, and she ambulated without the need for an assistive device and was able to get in and out of a chair and on and off the examination table without difficulty. She could take her shoes off and put them on without evident problems. The claimant's muscle strength was 5/5 in all groups, she could walk on her heels and toes and squat. Romberg testing was negative bilaterally, her reflexes were normal and symmetrical, and sensation was preserved in her upper and lower extremities. Dr. Cistola noted obesity and deconditioning.

Primary care treatment notes from this period also reflect normal gait and negative straight leg raise testing with ongoing complaints of neck and back pain. (See Exhibit 10F). A rheumatology treatment record from August of 2017 demonstrates muscle tenderness and 16 of 18 positive tender points, with no neurological symptoms. (See Exhibit 11F). The treating rheumatologist, Dr. Eli Steigelfest, advised aerobic exercise for weight control.

11

An x ray taken in December of 2017 showed degenerative changes at L4-5 with spondylolisthesis. There were also degenerative changes in the claimant's thoracic and cervical spine. (See Exhibit 16F). For the first time of record, straight leg raise testing was positive in January of 2018. The remainder of the claimant's physical examination remained the same, however. In February, straight leg raise testing was negative once more, and the claimant's gait remained normal. Her cervical and lumbosacral ranges of motion were limited secondary to pain, and 14 of 18 tender points were positive. Straight leg raise testing was positive on the right again in April but tested negative once more in May. (See Exhibit 19F). The claimant's strength was intact, and her sensory system, motor system, and gait were all normal.

In mid-2018, the claimant reported to her primary care provider that she had been diagnosed with rheumatoid arthritis (though no such diagnosis is reflected in the record). (See Exhibit 21F)[.] The last notes of record, generated in August of 2018 continue to reflect complaints of back pain and treatment for fibromyalgia. (See Exhibits 22F and 23F). The cla[i]mant continued to take oxycodone (three times a day) for pain that she rated as a "6" on a scale of one to ten, and she was advised by Dr. Steigelfest to engage in aerobic exercise to control her weight better.

With respect to the claimant's alleged mental problems, records dating back to early 2015 reflect complaints about low energy, stress, anxiety, depression and problems with concentration and fogginess. (See Exhibit 13F). It was on this occasion that the claimant was advised to use her CPAP due to the potential effect of a sleep disorder on her energy levels and focus. Her thinking was organized, and her memory remained intact. Subsequent records continue to reflect complaints about depression and anxiety with intact memory, organized thoughts and good insight and judgment. The claimant continued to cite a lack of energy in 2017 and, in September of 2017, reported sadness about the death of her mother, from whom she was estranged, and worry about being denied disability.

The claimant began treatment with Ten Broeck in January of 2018. (See Exhibit 14F). She indicated that she had a history of being abused by her father, who went to prison, and continued to suffer trauma from that, as well as issues connected to her mother's histrionic personality. The claimant cited depression and problems associated with physical pain. In April, the claimant indicated that medication (prazosin) was working very well for her nightmares and that they only occurred once a week now and were not as intense. She cited some ongoing depression and fatigue but stated it was better and that she was no longer dwelling on bad memories and dreams. The claimant also acknowledged that Cymbalta was helping to alleviate her depression and stated she was doing well overall. She was on a waiting list for therapy. Her thoughts were logical, her memory was intact, she was full oriented with full range affect, and her cognitive functioning was intact. In the final Ten Broeck treatment record from July of 2018, the claimant stated that her uncle was sick, and she was experiencing a mild uptick in her depression due to this. (See Exhibit 20F). She was handling things well though and was stable despite some stressful circumstances, including missing her kids. The claimant

12

denied delusions, suicidal ideation and hallucinations, and her mental status examination remained the same as described above.

As the foregoing discussion demonstrates, the claimant has consistently complained about pain in various places, most consistently her back and neck. On the majority of occasions, straight leg raise testing has been negative. On all occasions, the claimant's strength, reflexes, and gait have remained intact. The claimant's obese body habitus likely has an impact on her abilities, particularly her abilities to engage in postural movements, and consideration of those effects has been incorporated into the residual functional capacity. Overall, the evidence supports the finding that the claimant is limited to light exertion by her combination of ailments. She has additional postural limitations as set forth.

(AR 44–46.)

Worthington argues, among other things, that the ALJ improperly focused only on objective medical evidence in discounting her testimony about her fibromyalgia pain and fatigue and failed to discuss any other relevant regulatory factors in evaluating these specific subjective complaints. (Doc. No. 17.) The Commissioner argues that "a decision need not contain discussion and citations to every possible factor in order to be sufficiently specific" and that the ALJ "considered [Worthington's] stable and conservative treatment, the type of medication [Worthington] took for pain, and her improvement with medications." (Doc. No. 24, PageID# 934, 935 (citations omitted).)

Considering the record evidence as a whole, the Court finds that the ALJ's evaluation of Worthington's testimony about her fibromyalgia symptoms—particularly her fibromyalgia fatigue—lacks the support of substantial evidence. For example, while the ALJ acknowledged Worthington's testimony regarding her fibromyalgia fatigue at the outset of his analysis he did not discuss or cite any record evidence inconsistent with that testimony. The ALJ cited medical records from 2015 regarding Worthington's "alleged mental problems" showing that Worthington complained "about low energy" and "was advised to use her CPAP due to the potential effect of a sleep disorder on her energy levels and focus." (AR 46.) But these records predate Worthington's

disability onset date and are from a psychiatry appointment unrelated to her fibromyalgia. (AR 763.) The ALJ also mentioned that, in April 2018, Worthington "cited some ongoing depression and fatigue but stated it was better and that she was no longer dwelling on bad memories and dreams." (AR 46.) But the administrative record shows that Worthington made this remark to Cagle during a mental health appointment that did not address Worthington's fibromyalgia. (AR 817.)

Contrary to the ALJ's finding, Worthington's medical records from the relevant time period show that she consistently complained about fibromyalgia fatigue with a few rare exceptions. For example, Dr. Clark's and Dr. David Arehart's treatment notes state that Worthington "[a]dmit[ted] [f]atigue" at eleven appointments between February 2017 to August 2018 (AR 628, 630, 731, 734, 800, 806, 809, 820, 823, 826, 829) and only "[d]enie[d] [f]atigue" at four appointments in the same time period (AR 626, 725, 728, 837). Worthington also complained of fatigue to Dr. Cistola during an examination on June 26, 2017 (AR 714, 717), and reported "lots of fatigue" to Dr. Hemal Mehta on February 20, 2018 (AR 803). She "[d]enie[d] [f]atigue" during an appointment with physician assistant William Swafford on July 31, 2018 (AR 833).

The ALJ's discussion of "essentially unremarkable" "physical examination[s]" (AR 44); consistently normal clinical findings regarding Worthington's "muscle strength, reflexes and gait" (*id.*); consistently negative straight leg raise tests (AR 45); and generally normal ranges of motion (AR 45) is not in conflict with Worthington's fibromyalgia symptoms. As explained above, "fibromyalgia patients present no objectively alarming signs[,]" *Rogers*, 486 F.3d at 243, and "manifest normal muscle strength and neurological reactions and have a full range of motion[,]" *id.* at 244 (quoting *Preston*, 854 F.2d at 820); *see also id.* (holding that "fibromyalgia is not

14

susceptible of objective verification through traditional means"). Courts in the Sixth Circuit have therefore found that "standard clinical tests are 'not highly relevant' in diagnosing or assessing fibromyalgia or its severity." *Lawson v. Astrue*, 695 F. Supp. 2d 729, 744 (S.D. Ohio 2010) (quoting *Preston*, 854 F.2d at 820); *see also id.* (finding that "[f]ibromyalgia can be disabling even in the absence of objectively measurable signs and symptoms"). Consequently, none of the record evidence the ALJ discussed discredits Worthington's testimony regarding the severity of her fibromyalgia fatigue. The Commissioner has not pointed to any conflicting record evidence on appeal.

The Commissioner quotes *Stankoski v. Astrue*, 532 F. App'x 614, 619 (6th Cir. 2013), for the proposition that "'a diagnosis of fibromyalgia does not equate to a finding of disability or an entitlement to benefits.'" (Doc. No. 24, PageID# 936.) But *Stankoski* relied on *Vance v. Commissioner of Social Security*, 260 F. App'x 801, 806 (6th Cir. 2008), which held that "a *diagnosis* of fibromyalgia does not automatically entitle [a claimant] to disability benefits; particularly so here, where there is substantial evidence to support the ALJ's determination that [the claimant's] fibromyalgia was either improving or, at worst, stable." There is no such substantial evidence here. Rather, the record evidence shows that Worthington consistently complained about her fibromyalgia symptoms, especially her fibromyalgia fatigue.

The Court therefore finds that, with respect to Worthington's fibromyalgia symptoms, the ALJ's finding that Worthington's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record" (AR 44) is not supported by substantial evidence. This case should therefore be remanded to the ALJ to reconsider Worthington's fibromyalgia symptoms in light of the record evidence.

15
Case 2:20-cv-00023 Document 27 Filed 08/11/21 Page 15 of 17 PageID #: 962

### B. The ALJ's Analysis of Worthington's Mental Impairments and Their Impact on Her RFC

Worthington further argues that "the ALJ made inconsistent findings regarding the severity of [her] mental functioning in his decision" and that the limitations included in the ALJ's RFC "do not adequately account for [ ]Worthington's limitations in concentration, persistence, or pace." (Doc. No. 17, PageID# 917.) Because this case should be remanded to the ALJ for reconsideration of Worthington's fibromyalgia symptoms based on the record evidence, the Court need not address Worthington's argument regarding the ALJ's evaluation of her mental health limitations. The ALJ will no doubt need to reevaluate Worthington's concentration, persistence, and pace limitations in light of the reconsideration of Worthington's fibromyalgia symptoms. If necessary, Worthington may raise this issue again on appeal. *See Dawes v. Saul*, No. 3:19-cv-00001, 2020 WL 587426, at *8 (M.D. Tenn. Feb. 6, 2020), *report and recommendation adopted sub nom. Dawes v. Soc. Sec. Admin.*, 2020 WL 906227 (M.D. Tenn. Feb. 25, 2020); *Wilson v. Colvin*, No. 3:13-CV-84, 2014 WL 619713, at *6 (E.D. Tenn. Feb. 18, 2014).

### IV. Recommendation

For these reasons, the Magistrate Judge RECOMMENDS that Worthington's motion for judgment on the administrative record (Doc. No. 16) be GRANTED, that the ALJ's decision be VACATED, and that this case be REMANDED for further administrative proceedings consistent with this Report and Recommendation.

Any party has fourteen days after being served with this report and recommendation to file specific written objections. Failure to file specific objections within fourteen days of receipt of this report and recommendation can constitute a waiver of appeal of the matters decided. *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004). A party

who opposes any objections that are filed may file a response within fourteen days after being served with the objections. Fed. R. Civ. P. 72(b)(2).

Entered this 11th day of August, 2021.

_____
ALISTAIR E. NEWBERN
United States Magistrate Judge